Not for Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                    )
IN RE:                              )    CASE NO.      09-31897 (LMW)
                                    )
   ROBERT VIRGILI,                  )    CHAPTER       7
                                    )
         DEBTOR.                    )    ECF NO.       80
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES**

Zenas Zelotes, Eq.                  Attorney for Objector Kimberly Ann
P.O. Box 1052                        Virgili
Norwich, CT 06360


Jefferson Hanna, III, Esq.          Attorney for the Debtor
484 Main Street, Suite 23
Middletown, CT 06457


**MEMORANDUM AND ORDER RE:  OBJECTION TO EXEMPTION**

Lorraine Murphy Weil, Chief United States Bankruptcy Judge


        The matter before the court is Kimberly Virgili's (the "Objector") objection (ECF No. 80,

the "Objection")[1] to the above-referenced debtor's (the "Debtor") claim of exemption pursuant to

11 U.S.C. § 522(d)(10)(D) (the "Exemption")  with respect to a certain alleged "alimony" debt

owing from the Objector to the Debtor.  This court has jurisdiction over this contested matter as a

core proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and that certain Order dated September

_____

        [1]      References to the docket of this chapter 7 case appear in the following form: "ECF
No. __."

21, 1984 of this District (Daly, C.J.).[2]  This memorandum represents the findings of fact and conclusions of law mandated by Rule 52 of the Federal Rules of Civil Procedure (made applicable here by Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure).  For the reasons discussed below, the Objection is sustained.

## I.   **BACKGROUND**

### A.   **In General**

This chapter 7 case was commenced by a voluntary petition filed on July 13, 2009.  (*See* ECF No. 1.)  Filed with the petition were schedules and a statement of financial affairs (included in ECF No. 1, collectively, the "Original Schedules").   Schedule F (Creditors Holding Unsecured Nonpriority Claims) lists the Objector as a creditor and "co-maker on various loans."  (*See* ECF No. 1.)  Schedule  H (Codebtors) lists the Objector as a codebtor with respect to three debts.  (*See id.*)  Schedule B (Personal Property) lists (among other things) the following property: "Debtor is owed back alimony and child support from . . . [the Objector]," (*id.*).  Schedule C (Property Claimed as Exempt) elects the "federal list" of exemptions pursuant to 11 U.S.C. §§ 522(b)(2) and 522(d), but does not claim the Exemption.  (*See id.*)

On September 11, 2009, the Debtor was examined under oath by the Chapter 7 Trustee at the meeting of creditors (the "Section 341 Meeting") convened in this case pursuant to 11 U.S.C. § 341.[3]  It appears that the Original Schedules were not completely candid.  (*Cf., e.g.,* ECF No. 107 at 32:23–33:1, at 36:17-25, at 38:6-25, at 44:13-19 (testimony of the Debtor).)  The Original Schedules were amended from time to time.  (*See* ECF Nos. 19, 20, 78.)  On December 18, 2009, the Debtor

---

[2]      That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceeding arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

[3]      A compact disc of the Section 341 Meeting appears in the record as Exh. 15.

amended his original Schedule C again to elect the "federal list" and to claim (for the first time) the

Exemption as follows: "Debtor is owed back alimony and child support from . . . [the Objector] to

date of filing of bankruptcy petition (7/13/09)" pursuant to 11 U.S.C. § 522(d)(10)(D).  (*See* ECF

No. 78.)

The Objector filed the Objection on December 18, 2009.  (*See* ECF No. 80.)  In material part

the Objection asserted that "the [D]ebtor's contractual right to receive alimony (in the amount of

$1,442.23 per week [the "Weekly Payment"] for eight years) is a disguised property settlement and

that the aforementioned sum exceeds the amount 'reasonably necessary for the support of the

[D]ebtor and any dependent of the [D]ebtor,'" (ECF No. 80 ¶ 13).  No other objections to the

Exemption were filed.[4]

On September 11, 2009, the chapter 7 trustee filed a notice of assets available for distribution

and a bar date for proofs of claim.  (*See* ECF No. 25.)  The Debtor filed a waiver of his chapter 7

discharge on October 19, 2009.  (*See* ECF No. 39.)  On November 19, 2009, an order issued

approving the waiver and directing that no discharge enter in this chapter 7 case.  (*See* ECF No. 61.)

**B.      The Trial and the Continued Trial**

The Objection came on for trial (the "Trial")[5] on February 22, 2010.  The Debtor appeared

at the Trial (both personally and through counsel).  The Objector appeared at the Trial through

counsel, but did not appear personally because she was incarcerated at "York Correctional Facility

in Niantic" for contempt for having not paid the Weekly Payments.  (*See id.* at 42:8-15 (testimony

---

[4]       Counsel for the Objector appears to be of the opinion that these proceedings will be
dispositive of the dischargeability of the Weekly Payments in a potential future chapter 13 case in
respect of the Objector.  (*See* ECF No. 110 at 14 (Objector's brief).)  That issue is not ripe and will
not be addressed herein.

[5]       A transcript of the Trial appears in the record as ECF No. 107.

of the Debtor).)[6]   The Debtor was called as a witness for the Objector at the Trial, was cross-examined by his own counsel and the Objector introduced documentary evidence into the record. (*See* ECF No. 107.)  The Objector did not seek her own release in order to enable herself to testify at the Trial pursuant to a writ of habeas corpus *ad testificandum*, nor did she seek a continuance of the Trial pending her release.  (*See* Chapter 7 case docket; ECF No. 107.)  The matter was taken under advisement at the conclusion of the Trial (subject to briefing).  That briefing was completed. (*See* ECF Nos. 110, 112, 113.)

On September 8, 2010, the court issued that certain Order Scheduling Status Conference and Requiring Attendance of Counsel to consider (among other things) "whether the record of the . . . [the Trial] should be reopened to permit the Objector to testify (if she desires) and to permit the Debtor to testify to rebut her testimony (if he desires) . . . ," (ECF No. 128 at 1).  That status conference was convened on September 29, 2010 at which time the court exercised its discretion to reopen the record of the Trial (over the objection of the Debtor's counsel) for the foregoing purpose (the Objector no longer being incarcerated), and scheduled a continued trial (the "Continued Trial") for October 14, 2010.  (*See* Oral Record of 9/29/2010 status conference at 11:49:52 *et seq.* (the court was "not comfortable" with the record as it stood).)

The Continued Trial was convened as scheduled.[7]  The Objector appeared as her own witness, was cross-examined by counsel for the Debtor and introduced documentary (and recorded) evidence into the record.  The Debtor appeared for himself as a rebuttal witness and was cross-

---

[6]     The Debtor testified that the Objector owed the Debtor approximately $60,000 in "domestic support" as of January 25, 2010.  (*See id.* at 42:2-7 (testimony of the Debtor).)  The Objector testified at the Continued Trial (hereafter defined) that she owed "close to $80,000" to the Debtor as of the Continued Trial.  (*See* ECF No. 136 at 6:11-15 (testimony of the Objector).)

[7]     A transcript of the Continued Trial appears in the record as ECF No. 136.

- 4 -

examined by counsel for the Objector.[8]  At the conclusion of the Continued Trial, the court took the

matter under advisement (subject to briefing).  That briefing is complete (*see* ECF Nos. 142, 145,

149), and this matter is ripe for decision.

## II.    FACTS

This matter arises in substantial part from a certain Judgment of the Connecticut Superior

Court dated November 15, 2007 (a copy of which is included in Exh. 1, the "Judgment of

Dissolution") issued in that certain action captioned *Virgili v. Virgili,* FA 06 4005-775, then pending

in the Judicial District of Middlesex at Middletown (the "Dissolution Proceedings").  The Judgment

of Dissolution dissolved the marriage of the parties.  (*See id.*)   Attached to and incorporated by

reference into the Judgment of Dissolution (*see* Judgment of Dissolution at 2) is a certain Separation

Agreement (the "Separation Agreement") between the parties dated November 15, 2007 and

approved by the Superior Court as "fair and equitable."  (*See* Judgment of Dissolution at 2.)  For

analytical purposes, the facts set forth below are organized as follows: relevant pre-marital

background of the parties; significant events of the marriage/business relations of the parties prior

to the Dissolution Proceedings; the Dissolution Proceedings; the Separation Agreement; and relevant

post-Dissolution events.

### A.    Relevant Pre-Marital Background of the Parties

The Objector was born on July 15, 1960.  (*See* ECF No. 107 at 10:23 (testimony of the

Debtor).)  The Objector has a bachelor's degree in museum science from Virginia Commonwealth

University, and a master's degree in business from the University of Rochester.  After school, the

---

[8]    References herein to the exhibits appear in the following form:  "Exh. __."  With respect to Exh. 1, reference herein is to Exh. 1 after giving effect to ECF No. 164 ("Order of Substitution with Respect to Exhibit 1").

Objector worked in museums for several years, rising to the level of assistant director at a children's

museum.  Thereafter, the Objector left museum work and took a job with Bronson & Hutensky in

Connecticut selling trade show booths and sponsorships for the Celtics basketball team.  (*See* ECF

No. 136 at 9:11–10:15)  (testimony of the Objector).)[9]

The Debtor was born on November 4, 1948.  (*See* ECF No. 107 at 10:24 (testimony of the

Debtor).)[10]  At the time the Debtor and the Objector first met, the Debtor was a sales agent for a

company called Sharon Sales out of Massachusetts selling lawn and garden supplies to the trade.

(*See* ECF No. 136 at 10:20-23 (testimony of the Objector).)  As of that time, the Debtor had been

in the lawn and garden business for about three or four years.  (*See id.* at 10:24–11:4 (testimony of

the Objector).)

## B.    Significant Events of the Marriage/Business Relations of the Parties Prior to the Dissolution Proceedings

The parties married on August 27, 1988.  (*See* Exh. 1 at 1.)  The marriage produced one child

who was a minor as of the entry of the Judgment of Dissolution, a daughter (the "Daughter") born

on May 5, 1995.  (*See* Exh. 1 at 1.)

The Debtor stayed with Sharon Sales for a total of six or eight years.  "[T]hat company . . .

[was] put up for sale, so the gentleman that worked with . . . [the Debtor] that . . . [he] was the

closest to in the company . . . [and the Debtor] formed a company with . . . [their] wives called Four

Seasons Marketing."  (ECF No. 107 at 17:14-19 (testimony of the Debtor).)  That company was very

successful, had five sales people and ten office staff, and had about $23,000,000 or $24,000,000 in

---

[9]     The Debtor testified to a slightly (but not materially) different work history for the Objector.  (*See* ECF No. 107 at 48:4-16, 49:7-10 (testimony of the Debtor).)

[10]     The record does not disclose the Debtor's educational background.

gross sales per year.  (*See id.* at 17:19-23 (testimony of the Debtor).)  The Objector wanted to downsize and did not want to take on so much responsibility for doing business with independent garden centers and having outside sales people, so the Debtor and the Objector "broke up with . . . [their] partners in Massachusetts at the time and started Target Marketing [Incorporated (formerly known as Target Marketing, Inc., collectively, "Target Marketing")]."  (*See id.* at 17:24–18:5 (testimony of the Debtor).)[11]

> Target Marketing . . . held its organizational meeting May 24, 1999.[12]  It filed as a Connecticut Corporation with 5,000 shares issued and outstanding May 25, 1999. [The Debtor] . . . was named President and Director.  [The Objector] . . . was named as Secretary and Director.[13]  Each held 2,500 shares of common stock.  The name of the corporation was changed to Target Marketing Incorporated [on] June 4, 1999. The . . . [company] elected "S" corporation status with the Internal Revenue Service from the beginning.  The [c]ompany began operating out of the Virgilis' home and subsequently established its offices in Old Saybrook, Connecticut.

> . . .

---

[11]    An explanation for the Objector's desire to "downsize" may appear in the record:

And then . . . [the Objector] had a medical condition, and I . . . only know the abbreviated name for it, TMJ, and she found it difficult to work.  So, for a good period of time, she wasn't able to work until after she had surgery and recovered from it.

And then when I left [Sharon Sales] . . . and wanted to go on my own, she wanted to participate and be part of that.  I don't believe she was working at that time until we formed . . . [Four Seasons Marketing] and went into business in the lawn and garden industry.

(ECF No. 107 at 48:17–49:5 (testimony of the Debtor).)

[12]    The Debtor testified to an estimated incorporation date of April, 1999.  (*See* ECF No. 107 at 11:19-24 (testimony of the Debtor).)

[13]    The Debtor testified that the Objector was the Vice-President of Target Marketing. (*See* ECF No. 107 at 14:22-24 (testimony of the Debtor).)

The Company's primary business . . . [was] the brokering of plant material. Usually the plant material . . . [was] older, more mature ornamental shrubs. In effect, Target Marketing operate[d] as an independent representative for the growers . . . .

[On] July 1, 2002 Pacific Northwest Pride, a partnership was formed ("Pacific Pride"). The intent was to grow some of the product that Target Marketing sold. Pacific Pride was owned by its members: . . . [the Debtor] (50%) and . . . [the Objector] (50%). The partnership was dissolved in 2006 and a final return was filed. Prior to dissolution in 2006 inventory with a book value of $100,000 was transferred from Pacific Pride to Target Marketing.

[On] July 1, 2003, Saybrook Stonecrafters LLC ("Stonecrafters") was formed to import concrete lawn products from off-shore sources and sell them to garden centers all across the United States. Stonecrafters was owned by its members: . . . [the Debtor] (50%) and . . . [the Objector] (50%) . . . . At December 31, 2006 Stonecrafters reported on its accrual-tax basis tax return liabilities that exceeded its assets by $32,722. Its liabilities of $127,362 included $112,936 due Target Marketing.

[On] July 3, 2003, Pacific NW Transportation Services ("Transportation") was formed to provide truck brokering services. Transportation . . . was owned by its partners: . . . [the Debtor] (50%) and . . . [the Objector] (50%). The idea was to combine Target Marketing's loads with other transportation needed by other companies to cut Target Marketing's shipping costs. The enterprise was unsuccessful . . . . At December 31, 2006, on its accrual-tax basis tax return Transportation reported liabilities that exceeded its assets by $54,394 . . . .

(Exh. 6 at 9-10 (John M. Leask II CPA, LLC's valuation report dated November 5, 2007 in respect of Target Marketing) (the "Leask Report").)[14]  The Leask Report reports the performance of Target Marketing from calendar 2002 through calendar year 2006 in relevant part as follows:

---

[14]       The Leask Report was prepared for the Objector. Target Marketing and Stonecrafters hereinafter are referred to collectively as the "Business."

| Year ended: | Total Sales | Profit before taxes ("PBT") | Officers' Compensation | PBT plus Officers' Compensation | PBT plus Officers' Compensation as a Percent of Total Sales |
|---|---|---|---|---|---|
| 12/31/2006 | $ 9,023,878 | ($83,551) | $326,118 | $242,567 | 2.69% |
| 12/31/2005 | $12,339,389 | $    9,131 | $343,980 | $353,111 | 2.86% |
| 12/31/2004 | $11,157,586 | $   31,411 | $407,692 | $439,103 | 3.94% |
| 12/31/2003 | $10,940,520 | $253,637 | $369,231 | $622,868 | 5.69% |
| 12/31/2002 | $ 9,314,532 | $123,859 | $170,000 | $293,859 | 3.15% |

(Leask Report at 33.)  The Leask Report also reports Target Marketing's gross sales for the eight

months ended August 31, 2007 as $7,118,148.  (*See id.* at 10.)

The Debtor described the business relationship of the parties during their marriage generally

as follows:

> I was president of [Target Marketing] . . . and I did all the logistics and
> planning and negotiating.  Put together proposals for . . . [the Objector] to go to the
> chain stores with, by working with the growers that we did business with and putting
> together programs that would be appealing to the chain stores and to the garden
> centers.

> So I was the liaison with all our wholesale suppliers for Target Marketing.
> . . .

> Well . . . [the Objector] had our two largest customers to deal with, Lowe's
> and Home Depot with both -- for both companies, and that was . . . her primary
> responsibility.  I mean I'm not saying that she didn't do other  things as half owner
> and vice president.  She  managed the staff in the office pretty much because I wasn't
> there on a full-time basis like she was, though she had to travel to see her buyers all
> over the country but for short durations.  I would have trips of two to three weeks at
> a time.  But anyway, so her responsibility was calling on two customers and
> developing and establishing business with them.

> I basically . . . [also] was primarily responsible for all of the operational
> affairs of [Stonecrafters] . . . .

- 9 -

> We took salaries out from 150 [thousand dollars] up to 200 [thousand dollars], and at one point, we went back down again as we went through some internal changes with our business and dealing with different receivable issues, but I would say that we comfortably supported ourselves and our daughter.

(ECF No. 107 at 14:3–15:7, at 17:3-6, at 18:21–19:2 (testimony of the Debtor).)  The Objector's relevant testimony was not materially different.  (*See* ECF No. 136 at 11:19–16:17 (testimony of the Objector).)  Based upon the foregoing (and giving due regard to the Objector's skill set), the court finds that the Debtor was the "brains" of the Business.

## C.   The Dissolution Proceedings

The Objector commenced the Dissolution Proceedings in July of 2006.  (*See* ECF No. 136 at 16:22 (testimony of the Objector).)  The Dissolution Proceedings almost immediately went into "mediation" which lasted into the date scheduled for trial.  (*See id.* at 57:7-13 (testimony of the Objector).)  The parties agree that two major issues were: custody of the Daughter (*see id.* at 82:8-12 (testimony of the Debtor));[15] and "a separation of the . . . marital assets [*e.g.,* their respective interests in the Business]," *id.* at 57:9-10 (testimony of the Objector)).  The concept of child support, "alimony" payments and a property settlement were addressed only after the custody agreement was reached.  (*See id.* at 82:14–83:1 (testimony of the Debtor).)

Both parties to the Dissolution Proceedings had valuations of the Business done.[16]  (*See* ECF No. 136 at 17:2-6 (testimony of the Objector).)  Meyers, Harrison & Pia prepared a valuation of the Business for the Debtor.  (*See id.* at 17:24–18:11 (testimony of the Objector); Exh. 5 (valuation of

---

[15]     A final order of custody in respect of the Daughter was entered in the Dissolution Proceedings on September 12, 2007.  (*See* Exh. 1 at 2.)

[16]     The valuations discussed herein actually appear to have been with respect to Target Marketing alone.  However, for ease of analysis and because it makes no difference to the result, the court hereinafter will use the term "Business" instead of "Target Marketing."

the Business prepared for the Debtor by Meyers, Harrison & Pia) (the "MH&P Report").)  The

MH&P Report valued a one hundred percent interest in the Business at $2,025,000 "[a]t or near

December 31, 2006," (Exh. 5 at 8).  The Leask Report was prepared for the Objector.  (*See* ECF No.

136 at 21:2-8 (testimony of the Objector).)  The Leask Report valued a one hundred percent interest

in the Business at $920,000 as of December 31, 2006.  (*See* Exh. 6 at 2.)

On or about February 2, 2007, the Debtor filed an Emergency Motion for Order, Pendente

Lite.  (*See* Exh. 12, the "Emergency Motion.")  The Emergency Motion stated in relevant part:

> On January 26, 2007, the defendant received written notice from the corporate
> counsel and the plaintiff wife terminating the defendant's employment . . . and
> indicating that he will no longer receive a salary from the company and that he was
> terminated from the business . . . .  The defendant believes that there has been a
> violation of the automatic orders as the plaintiff has precluded the defendant from
> earning an income and has precluded the defendant access to the asset, *i.e.,* the
> [B]usiness.

(Exh. 12 at 1.)  Among other things, the Emergency Motion demanded the following relief: "[an

order] that the defendant be permitted to return to work and to receive all the benefits of the

[B]usiness including his payroll . . . [and an order] that the plaintiff not preclude the defendant's

involvement in the [B]usiness . . . ," (*id.* at 2).  The Objector admits that the Debtor's employment

and salary had been so terminated.  However, she claims:

> Well, for a period of several months -- I think it was from like, September of 2006
> through January of 2007, . . . [the Debtor] failed to show up to work, and we were
> encouraged to keep a record of his comings and goings of the office.  And . . . after
> that time, you know, the company just couldn't afford to keep him on the payroll
> anymore without performing services. So because he was a W-2 wage earner and he
> was not showing up for work, I was able to terminate his payroll.

(ECF No. 136 at 42:21–43:7 (testimony of the Objector).)  The Debtor claims:

> I never stopped working at Target Marketing.  I was shut out of Target Marketing.
> I remained the president and 50 percent owner until I, in December of 2007, gave up

my shares. But I did have my salary discontinued by Kim through . . . a termination letter that was sent to me . . . on January 25th.

(ECF No. 136 at 72:8-18 (testimony of the Debtor).) The Debtor has not claimed that any disability then kept him from working for the Business. The Superior Court granted the following relief on the Emergency Motion: monthly payments in the amount of $1,000. (*See* ECF No. 136 at 83:17-18 (testimony of the Debtor).)[17]

The Objector testified that, in 2007, she believed that the Debtor could make his own way if he left the Business permanently, and even attempted to obtain alternative employment for the Debtor:

> Q.    . . . And at the time of the divorce, did you have any reason to believe that . . . [the Debtor] was incapable of performing services similar in nature to those which he performed in connection with Target Marketing? Did you consider him capable of performing?
>
> A.    Absolutely capable, yes.
>
> > . . .
>
> Q.    And Ms. Virgili, did you . . . make efforts to secure employment for . . . [the Debtor]?
>
> A.    Yes, I did.
>
> Q.    What efforts did you take?
>
> A.    Well, during our many negotiations of property settlement discussions, Jim [*i.e.*, the Debtor] had indicated to me that he just wanted a job and would like to continue to be active and . . . be employed. And I made an arrangement with a nursery out in Oregon, Cherry Creek Nursery, Cascade West Trees, which was Target Marketing's biggest supplier of nursery stock. I negotiated with them to retain Jim as a quality control purchaser . . . of nursery stock that I would ultimately buy from them. And they agreed to that arrangement and they offered Jim a very lucrative position.

---

[17]      At the Continued Trial, the Debtor called those payments "temporary alimony" but then admitted that "I don't even know what that was called, exactly," (*id.* at 83:18-19 (testimony of the Debtor)).

> Q.      And Ms. Virgili, did . . . [the Debtor] express interest in this position?
>
> A.       Initially he did. He even traveled to Oregon, traveled to their corporate headquarters in Colorado. But then, for whatever reason, didn't pursue it.
>
> Q.      Okay.  And did you believe . . . [the Debtor] capable of this position?
>
> A.      Absolutely.
>
> Q.      Okay. And what --
>
> A.      More than capable.
>
> Q.       – and what year was -- was all of this happening . . . ?  What time frame?
>
> A.      This was in 2007.

(ECF No. 136 at 33:8–34:25 (testimony of the Objector).)  The court credits that testimony.  The Debtor has not explained why he failed to follow up on that opportunity.

The Debtor testified at the Continued Hearing that, at the time, he entered into the Separation Agreement, he "knew . . . [he] was facing medical issues . . . ," (*id.* at 73:6-7 (testimony of the Debtor)).  He further testified that "I'd already had one surgery, a triple anterior cervical fusion on my neck.  My orthopedic surgeon said I would have to continue to have further surgeries."  (*Id.* at 73:7-10 (testimony of the Debtor).)  There is nothing in the record to support a finding that the Debtor's health was a factor in the negotiation of the Separation Agreement.  Accordingly, based on the Objector's testimony at the Continued Hearing (*see id.* at 33:8-15 (testimony of the Objector)), the court finds that the Debtor's health was not a factor in the negotiation of the Separation Agreement.

The parties discussed various approaches to dealing with the Business in the context of the impending marital dissolution: the Debtor would buy the Objector's interest in the Business for

$1,000,000 (*see* ECF No. 136 at 74:14-19) (testimony of the Debtor));[18] or the Business would be

sold in connection with the Dissolution Proceedings and the net proceeds divided equally between

the parties (*see* Exh. 9 ¶ 5 (Plaintiff's Proposed Orders dated November 14, 2007));[19] or the Debtor

would transfer his interest in the Business to the Objector for consideration (*see* Exh. 1 ¶ 12.C).

### D.    **The Separation Agreement**

The Separation Agreement was entered into by the parties on November 15, 2007 in lieu of

a contested hearing scheduled for the same day.  (*See* ECF No. 136 at 81-83 (testimony of the

Debtor).)  The Separation Agreement provides in relevant part as follows:

> [I]n an effort to minimize the disputes and stress that often arise during the
> dissolution of a marriage, husband and wife have reached the following agreements:
>
> . . .
>
> 3.    CUSTODY & PARENTAL RESPONSIBILITY PLAN:
>
> A.)    The Husband and Wife shall have joint legal custody and
> shared custody, pursuant to the final order of custody ordered by Judge Elaine
> Gordon dated September 12, 2007;
>
> 4.    CHILD SUPPORT:
>
> A.)    The wife will pay child support to the husband of $200.00 per
> week upon the shared parenting . . . .
>
> 6.    LIFE INSURANCE:
>
> A.)    So long as the Wife has any financial obligation to the
> Husband hereunder, she shall designate him as beneficiary of unencumbered life

---

[18]    However, the Objector testified that "there was nothing documented for . . . [the Debtor] to keep the company.  There was . . . some consideration for us splitting the company and me going off in one division [of the Business] and . . [the Debtor] managing another division [of the Business] . . . ." (*Id.* at 57:21–58:2 (testimony of the Objector).)

[19]    Among the Objector's exhibits are documents evidencing certain stages of the negotiations between the parties with respect to the Business.  (*See* Exhs. 7, 11, 13.)  Because the court deems them not very helpful unless placed in the entire course of the negotiations (which is not of record), the court gives those exhibits little weight.

insurance, initially coverage in the face amount of $420,000. The Wife shall be entitled to reduce such coverage so long as the amount remains sufficient to meet her obligation(s) under the foregoing [sic] section(s) 10 (alimony). The Wife shall notify the Husband at least one month prior to any such reduction and, if the Husband notifies the Wife within that one-month period that he disputes the amount of the reduction and the parties are unable to agree on the reduced amount, they shall return to court for resolution of the amount prior to Wife's taking any steps to reduce the amount . . . .

C.)     If the Husband survives the Wife and for any reason does not receive the full benefit of the life insurance specified in this section, he shall have a preferred creditor's claim against the estate of the Wife for the full amount of the insurance proceeds payable to him hereunder, less the amount of such proceeds actually received by him.

. . .

10.     <u>ALIMONY:</u>

A.)     The Wife shall pay periodic alimony to the Husband in the amount of $1,442.23 per week for a period of eight (8) years from the date of dissolution. Said award of alimony shall be non-modifiable as to term and amount. No modification or termination for any reason, except that alimony shall terminate upon the death of either party.

. . .

12.     <u>PROPERTY SETTLEMENT:</u>
. . .

C.)     The Husband shall transfer all of his right, title and interest in the businesses known as Saybrook Stone Crafters, LLC and Target Marketing, Inc. and the Wife shall hold the husband harmless for any and all business obligations, lawsuits, taxes, expenses in consideration for the husband's transfer of this interest in said businesses. The Wife shall pay to the Husband a lump sum property settlement in the amount of $200,000.00 which shall be made payable to Lisa A. Faccadio, Trustee for the Husband which shall be due and payable within 21 days from date of judgment. The Husband shall agree not to compete with said Business for eight (8) years [a "Non-Competition Agreement"], and will sign all necessary paperwork to that effect . . . .

- 15 -

14.   <u>BANKRUPTCY:</u>

Each party shall pay to the other the sum of $1.00 per year as nominal alimony. Such alimony shall be modifiable only in the event that either party files a petition in bankruptcy or is placed in involuntary bankruptcy and by such attempts to avoid obligations contained in this agreement, in which case the court may modify the amount or term of alimony.

(Exh. 1 (Separation Agreement).) As noted above, the Judgment of Dissolution was issued the same day and the Separation Agreement was incorporated therein.

The Objector testified at the Continued Trial in relevant part as follows:

Q.      So, . . . as between the two estimated valuations . . . one half interest, according to you, would have been worth 500,000 [dollars], and one half interest would have been worth $1 million, according to . . . [the Debtor's] expert.

A.      Correct . . . .

Q.      Okay. And what . . . did you agree to accept in exchange for the transfer of the business assets? What amount?

A.      800,000 [dollars].

Q.      Which is approximately halfway between those two figures?

A.      Yes.

(ECF No. 136 at 22:8-23 (testimony of the Objector).) The Objector claims that the $200,000 "property settlement" payment plus the Weekly Payments for eight years ($1,442.23 x 52 x 8 = $599,967.68) were, when taken in the aggregate, a compromise property settlement for the transfer of the Debtor's half of the Business at the $800,000 figure (*i.e.,* $200,000 plus $599,967.68 equals (approximately) $800,000. (*See* ECF No. 142 at 4 (Objector's brief).)

The Debtor testified at the Continued Trial in relevant part as follows:

Q.      So it was your intention that you were going to have [approximately] $75,000 [per year for eight years in] alimony. And did you think you would be able to work and . . . supplement your income?

- 16 -

A.      That was my hope, yes.

. . .

Q.      And . . . something has been said about tax implications of this. To your knowledge, what was the tax implication of you accepting alimony versus you accepting a property settlement?

A.      Well, the day that the agreement was reached, I was told if I accepted this offer as alimony, I would be responsible for paying taxes on it.  But that was how it was being proposed to me and so I said, okay.

Q.      So there's no benefit to you . . . taxwise to do that?

A.      No.  None whatsoever . . . .

A.      My only tax benefit was the property settlement portion of the dissolution, which was the 200,000 [dollars].

Q.      At the time that you entered into this agreement, did you believe that Target Marketing and Saybrook Stonecrafters were solid companies?

A.      2006, I believe, was the best year that the companies ever had.  And so it was my fervent hope that the company would continue to grow under her leadership and tutelage and – and sales, and be extremely profitable, which is why I agreed to such a prolonged eight-year agreement . . . .

(ECF No. 136 at 76:19-23, at 77:4–78:6 (testimony of the Debtor).)  The initial $200,000 payment provided for in Section 12 of the Separation Agreement ("Property Settlement") was intended to compensate the Debtor for his entry into the Non-Competition Agreement.  (*See* ECF No. 136 at 60:22–61:14 (testimony of the Objector); Exh. 14 at 9 § 13 (Debtor's admission that "he ha[d] received fair and adequate consideration" for his entry into the Non-Competition Agreement).)

### E.      Relevant Post-Dissolution Events

The parties ultimately entered into a Non-Competition Agreement in accordance with the Separation Agreement.  (*See* ECF No. 136 at 50:14 (testimony of the Objector).)  Prior to the execution of that document, the Objector (presumably through counsel) had prepared and submitted to the Debtor and/or his counsel a form (*i.e.,* Exh. 14, the "Proposed Non-Competition Agreement")

- 17 -

of Non-Competition Agreement.  The Debtor signed that document on December 12, 2007, but the

Objector refused to execute that document because the Debtor had crossed out Section 20 thereof.

(*See* Exh. 14 (partially executed form of Non-Competition Agreement); ECF No. 136 at 50:5-7 ("I

never signed it because of him crossing out [Section] . . . 20, the nondisparagement part.")

(testimony of the Objector).)[20]

Shortly after the issuance of the Judgment of Dissolution, the Business (which both parties

had counted on to fund the Weekly Payments) failed:

> Q.     . . .   And then just for everybody's edification, what happened to the
> company? Why weren't you [*i.e.,* the Objector] able to pay the alimony?
>
> A.     Well, very shortly after the divorce was final, approximately January of '08,
> a few months later, I lost all of my contracts with Home Depot, Lowe's, Walmart,
> one right after another after another. Just said, we can't do business with you
> anymore.
>
> Q.     And those were your big contracts . . . .
>
> A.     Those were my only contracts.
>
> Q.     I see. And were you able to replace them with other contracts? . . .
>
> A.     No.  No.  I held onto two orders for that next cycle, that next selling season.
> I had two of my customers – gave me, I guess you'd call them mercy orders, but very
> insignificant. But it kind of kept the lights on for a little while.

(ECF No. 136 at 65:8–66:5 (testimony of the Objector).)  The Business ceased operations in late

2008.  (*See id.* at 7:14-18 (testimony of the Objector).)  The Debtor concedes that the failure of the

---

[20]     Exh. 14 was admitted as an exhibit but only to the extent that Section 13 thereof
(when combined with the Debtor's signature) constitutes an admission by the Debtor (discussed
below).  (*See* ECF No. 136 at 51:3–54:11 (remarks by counsel for the parties and the court).)

Business was not foreseeable (at least to the parties).[21] (*See id.* at 79:2-3 ("If it had been foreseeable, I would have wanted a[n immediate] cash settlement.") (testimony of the Debtor).)

The Debtor's Amended Statement of Financial Affairs states that: in 2007, the Objector paid the Debtor $53,652.00 in "[a]limony and child support;" in 2008, the Objector paid the Debtor $80,470.12 in "[a]limony and child support" and $10,400.00 in "child support;" and in 2009, the Objector paid the Debtor $21,482.44 in "[a]limony and child support" and $5,200 in "child support." (*See* ECF No. 19 at 1 (item 2).)[22] The Objector ceased making the Weekly Payments to the Debtor in 2009. (*See* ECF No. 107 at 29:18-19) (testimony of the Debtor).) The Objector stopped paying the Debtor's COBRA (medical) insurance "some time ago [as of the Trial]" and he is on the Medicaid and HUSKY programs. (*See id.* at 46:2-4 (testimony of the Debtor).) The Debtor is on temporary financial assistance, fuel assistance from CRT and is getting food stamps. (*See id.* at 56:1-3 (testimony of the Debtor).) He claims to have no material assets. (*See id.* at 58:5-15 (testimony of the Debtor).)

The Debtor had limited employment opportunities partly because of the Non-Competition Agreement (at least until the Business closed) and partly because of an increasing level of physical disability. (*See* ECF No. 107 at 39:4-7 (testimony of the Debtor); *id.* at 55:18–57:11 (testimony of the Debtor); ECF No. 136 at 73:9-23 (testimony of the Debtor); *id.* at 89:21–92:14 (testimony of the Debtor); *id.* at 94:9–95:14 (testimony of the Debtor).) The Objector also has not done well economically in the wake of the failure of the Business. (*See* ECF No. 136 at 6:19–7:13, at 8:1-12

---

[21] However, there are some ominous observations about the continued viability of the Business in the Leask Report. (*See* Exh. 6 at 11 ("Company Weakness").)

[22] Duplicate references to "child support" for 2008 and 2009 appear in the document itself.

(testimony of the Objector).)  The Objector claims to be insolvent.  (*See id.* at 8:13-21 (testimony of the Objector).)

The Debtor initiated contempt proceedings against the Objector for her failure to make Weekly Payments beginning in September of 2009.  (*See* ECF No. 107 at 47:3-16 (testimony of the Debtor).)  In or about early 2010 there were proceedings against the Objector for her failure to pay Weekly Payments at which the Objector was held in contempt and incarcerated (as noted above) on or about February 1, 2010.  (*See* ECF No. 107 at 42:8-15, at 47:23–48:2 (testimony of the Debtor); ECF No. 136 at 5:6– 6:7 (testimony of the Objector).)  The Objector apparently was released from that incarceration notwithstanding that she appears not to have paid the $40,000 "purge amount." (*See* ECF No. 136 at 6:1-10 (testimony of the Objector); *see also id.* at 66:16–67:3 (testimony of the Objector).)[23]

---

[23]

Q.      [N]ormally, courts don't make these [contempt] decisions very lightly.  So where . . . would $40,000 [purge amount] have come from?  Did you have assets or something or –

A.      No.  I think they thought my father would come forward and – and make sure.  He didn't want to see his daughter go to jail.  I think that was the strategy, quite frankly, because it happened once before.  My father, you know, came forward with the money . . . to prevent me from being incarcerated.

(*Id.*)

### III.   APPLICABLE LAW

#### A.   Exemptions (In General)

Exemptions in bankruptcy are governed by Section 522 of the Bankruptcy Code and Rule 4003 of the Federal Rules of Bankruptcy Procedure.

> The effect of an exemption is twofold. First, the exempted property is removed from the estate and is not distributable to unsecured creditors in bankruptcy. *See* 11 U.S.C. § 522(b). Second, to the extent set forth in Section 522(c), the exempt property is placed beyond the reach of the debtor's prepetition creditors outside of bankruptcy.

*Banner v. Cadle Co. (In re Banner),* 394 B.R. 292, 299 (Bankr. D. Conn. 2008). In the context of an objection to a claimed exemption, the objector bears the initial burden of production and the ultimate risk of nonpersuasion. *See* Fed. R. Bankr. P. 4003(c); *In re Lawton,* 324 B.R. 20, 21 (Bankr. D. Conn. 2005) (Dabrowski, J.). The objector must show by a preponderance of the evidence that the claimed exemption is improper. *See In re Kelley v. Locke (Kelley),* 300 B.R. 11, 16-17 (BAP 9th Cir. 2003); *In re Ventura,* No. 10-79815-dte, 2011 WL 1979864, at *2 (Bankr. E.D.N.Y. May 20, 2011).

#### B.   11 U.S.C § 522(d)(10)(D)

As noted above, the Debtor elected the Section 522(d) "federal list" of exemptions pursuant to Bankruptcy Code § 522(b)(2). Section 522(d) provides in relevant part: "The following property may be exempted . . . (10) [t]he debtor's right to receive . . . (D) alimony, support, or separate maintenance, to the extent reasonably necessary for the support of the debtor and any dependant of the debtor . . . . " 11 U.S.C.A. § 522(d) (West 2012). What constitutes "alimony" within the purview of Section 522(d)(10)(D) "is a question of federal, not state, law," *DeHart v. Miller (In re Miller),* 424 B.R. 171, 174 (Bankr. M.D. Pa. 2010). The analysis of what constitutes "alimony" for Section 522(d)(10)(D) purposes is the same as is used to determine what constitutes "alimony" under

- 21 -

the pre-BAPCPA version of 11 U.S.C. § 523(a)(5) and under the current version of 11 U.S.C.

§ 101(14A)(B).[24]  *See In re Joseph,* 157 B.R. 514, 518 (Bankr. D. Conn. 1993) (Krechevsky, J.)

("There is no readily apparent reason why a bankruptcy court should use different standards in

reviewing alimony awards in the nondischargeability instance and in the exemption instance."); *cf.*

H.Rep. No. 95-595, at 362 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6318 ("Paragraph (10) [of

Section 522(d)] exempts certain benefits that are akin to future earnings of the debtor.").

> "[T]he question [of] whether obligations under a divorce decree constitute alimony/
> maintenance within the meaning of Section 523(a)(5) . . . is a question . . . to be
> decided by the bankruptcy court on the basis of all the facts and circumstances, and
> that the bankruptcy court may, indeed must, reject the characterization applied to the
> obligation by the . . . parties if warranted by a consideration of all the facts."

*Duffy v. Taback (In re Duffy),* 331 B.R. 137, 141 (Bankr. S.D.N.Y. 2005), *aff'd,* 344 B.R. 237

(S.D.N.Y. 2006).  *See also In re Joseph, supra* at 517 (Section 522(d)(10)(B) context).

> In divining the true nature of a domestic obligation, an initial and important
> consideration is the intent behind the obligation. In those cases where a state court
> issues a divorce decree after a *contested* hearing, the only relevant intention is that
> of the state court; the bankruptcy court's function is limited to an examination of the
> state court's purposes.
>
> In instances . . . in which the substance of the divorce decree was an agreement
> reached and drafted by the parties and subsequently "blessed" by the Superior Court's
> approval, the analysis is not so straightforward. In such a context, the intentions of

---

[24]       Prior to the 2005 amendments to the Bankruptcy Code (the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, "BAPCPA"), Section 523(a) provided in relevant
part as follows:  "A discharge under section 727 . . . of this title does not discharge an individual
debtor from any debt – . . . (5) to a . . . former spouse . . . for alimony to . . . such spouse . . . . "  11
U.S.C.A § 523(a) (West 2005) (repealed by BAPCPA).  BAPCPA did not effect any change to the
language of Section 522(d)(10)(D).  BAPCPA deleted the reference to "alimony" in Section
523(a)(5), substituting instead the new defined term "domestic support obligation."  *See* Pub. L. No.
109-8, 119 Stat. 23; 11 U.S.C.A. § 523(a)(5) (West 2012).  However, the term "alimony" reappears
in the definition of "domestic support obligation" created by BAPCPA.  *See* 11 U.S.C.A.
§ 101(14A)(B) (West 2011).  The parties here do not suggest that BAPCPA effected any change to
the standards applied for determining alimony *vel non* under Section 522(d)(10)(D), and the court
proceeds on that assumption.

the parties at the time of their agreement also become relevant to the question of the purpose of the subject obligation.

. . .

[C]ertain objective "factors" [are] traditionally utilized . . . in divining the actual nature of an obligation imposed in a divorce decree: *e.g.*, (1) the label given the obligation in the decree, (2) the form and placement of the obligation in the decree, (3) whether the obligation terminates on death, remarriage, etc., (4) the economic disparity between the parties, (5) the length of the marriage, (6) the presence of minor children, (7) the age, employability, and educational level of the parties, and (8) the financial resources, actual or potential, of each spouse.

*Detels v. Nero (In re Nero),* 323 B.R. 33, 38 (Bankr. D. Conn. 2005) (Dabrowski, J.) (Section 523(a)(5) proceeding) (footnote omitted).   Certain other factors are discussed in *Collier on Bankruptcy.*  (*See* 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.11[6], at 523-84 (16th ed. 2009) ("*Collier on Bankruptcy*").)   To the extent relevant, certain *Collier* factor(s) have been considered herein and are discussed below.   No list of "factors" is exclusive and all facts and circumstances may be considered.   *See In re Duffy,* 331 B.R. at 141.

## IV.   <u>APPLICATION OF LAW TO FACT</u>

Below the court applies the factors articulated in *Nero, supra,* to the record herein.

• *Factor 1 - "the label given the obligation in the . . . [Separation Agreement]."*  The Separation Agreement labels the Weekly Payments as "Alimony."  (*See* Separation Agreement § 10.)  However, the "Alimony" is "non-modifiable as to term and amount," (Exh. 1 § 10), which is more consistent with a debt incurred in exchange for consideration given.  Given all of the foregoing, the court gives this factor some slight weight in the Debtor's favor.

• *Factor 2 - "the form and placement of the obligation in the . . . [Separation Agreement]."*   The Separation Agreement has separate provisions for "Alimony" (Separation Agreement § 10) and "Property Settlement" (Separation Agreement § 12).  The court gives that factor some weight in the Debtor's favor.

• *Factor 3 - "whether the obligation terminates on death, remarriage, etc."*  Under the Separation Agreement, the Objector's obligation to pay  the Weekly Payments "terminate[s] upon the death of either party," but not upon

- 23 -

remarriage.  (*See* Separation Agreement § 10.)  Moreover, the termination of
the Objector's Weekly Payments obligation upon her death is substantially
illusory.  That is because the Separation Agreement required the Objector to
secure payment of her Weekly Payments obligation thereunder with a life
insurance policy in the initial amount of $420,000,  (*See* Separation
Agreement § 6.)  Moreover, Section 6.C. of the Separation Agreement
provides "[i]f the Husband survives the Wife and for any reason does not
receive the full benefit of the life insurance specified in this section, he shall
have a preferred creditor's claim against the estate of the Wife for the full
amount of the insurance proceeds payable to him hereunder, less the amount
of such proceeds actually received by him."  (*Id.*)  An unmatured domestic
support obligation typically is not a claim against the payor's probate estate.
On the other hand, the Weekly Payments obligation terminates on the death
of the Debtor.  That is consistent with a support obligation.  Given all of the
foregoing, the court gives some weight on this factor in the Debtor's favor.

- *Factor 4 - "the economic disparity between the parties [at the time of the
  Dissolution]."*  There is insufficient evidence in the record for the court to
  include this factor in its analysis.

- *Factor 5 - "the length of the marriage."*  The parties have not sufficiently
  developed the record as to why this factor is relevant here.

- *Factor 6 - "the presence of minor children."*  Although there was a minor
  child (*i.e.,* the Daughter), the Separation Agreement makes separate provision
  for child support.  (*See* Separation Agreement § 4.)  Accordingly, the court
  does not include this factor in its analysis.

- *Factor 7 - "the age, employability, and educational level of the parties."*
  The Debtor was about fifty-nine years old and the Objector was about forty-
  seven years old as of the date of the Separation Agreement - a twelve year age
  difference.  However, the Debtor was not a manual laborer; he was a talented
  and experienced salesman and entrepreneur (*i.e.,* the "brains" of the
  Business).[25]  On the other hand, the Objector was less experienced and
  capable.  As noted above, the Debtor's health was not a factor in the
  negotiation of the Separation Agreement.  It is true that, pursuant to the
  Separation Agreement, the Debtor would be saddled with the eight-year Non-
  Competition Agreement which constrained his future income potential.
  However, the initial $200,000 payment under Section 12 of the Separation
  Agreement was intended to compensate the Debtor for his entry into the Non-
  Competition Agreement.  (*Cf.* ECF No. 136 at 60:22–61:14 (testimony of the

---

[25]     As a result, his educational background is irrelevant.

Objector); *see also* Exh. 14 at 9 § 13 ("Executive further agrees that he has received fair and adequate consideration for this Agreement.").) Taking into account all of the facts and circumstances, the court gives this factor considerable weight in the Objector's favor.

• *Factor 8 - "the financial resources, actual or potential, of each spouse."* The parties have not sufficiently developed the record on this factor for the court to include this factor in its analysis.[26]

There is an additional and weighty factor in the Objector's favor. As noted above, the Objector testified that the Separation Agreement constituted (in relevant part) an (approximately) $800,000 property settlement. (*See* ECF No. 136 at 22:8-23 (testimony of the Objector).) The court finds the Objector to be a reliable witness and credits that testimony. Moreover, the Debtor (who is found to be a less credible witness) substantially admitted the foregoing on at least two occasions. The first admission is set forth in Section 13 of the Proposed Non-Competition Agreement, which was signed in material part by the Debtor and which stated in material part as follows:

---

[26]

[S]ome courts have considered the tax treatment given to marital obligations under the Internal Revenue Code, since both Codes attempt to distinguish obligations in the nature of alimony, maintenance or support from property division obligations.

. . .

The Bankruptcy Code and the Internal Revenue Code have different purposes; tax treatment by itself should not be dispositive of dischargeability under section 523(a)(5). As with other factors, courts can and should look to the tax treatment given to the obligation in conjunction with the other factors discussed above.

(4 *Collier on Bankruptcy* ¶ 523.11[6][h], at 523-88 (16th ed. 2009) (footnotes omitted).) It is a fair inference that the Debtor agreed to the "alimony" label (and the resulting detrimental tax treatment for him) not because he believed it to be accurate but, rather, because that concession was necessary finally to get the deal done with the Objector. (*See* ECF No. 136 at 77:9-13, at 80:9–81:13 (testimony of the Debtor).) The record does not disclose whether the Objector actually took a tax deduction for the "alimony." For the foregoing reasons, the court does not weigh this factor in either party's favor.

> [The Debtor] . . . acknowledges and agrees that the EIGHT year restrictions on competition, solicitation of customers and suppliers, and solicitation of employees as set forth in Sections 6, 7 and 8 herein are reasonable and are intended to correspond with the *EIGHT year payout period for . . . [the Objector's] Acquisition of . . . [the Debtor's] interest in the . . . [Business]*.

(Exh. 14 at 9 § 13 (emphasis added).)   The second admission took place in the course of the Debtor's sworn testimony at the Section 341 Meeting where he testified in material part as follows:

> "[I]n November of 2007, we reached an agreement where I transferred all my shares . . . [in the Business] to her in return for an eight hundred thousand [dollar] settlement which was . . . the alimony . . . ."

(Exh. 15 (Oral Record of Section 341 Meeting at15:47–16:02 (testimony of the Debtor)).)[27] Further supporting testimony was given at the Continued Hearing when the Debtor admitted that he had "agreed to such a prolonged eight-year agreement" only because he had believed in the continued viability of the Business.  (*See* ECF No. 136 at 78:1-12 (testimony of the Debtor); *id.* at 79:2-3 (Had the Debtor not so believed, he "would have wanted a[n all] cash settlement.") (testimony of the Debtor).)

Based upon all of the foregoing and the entire record of this case, the court is persuaded that the Weekly Payments obligation is a disguised property settlement obligation and is not "alimony" (or "support or separate maintenance") within the purview of Bankruptcy Code § 522(d)(10)(D).[28]

---

[27]     The Debtor attempted to change that testimony at the Continued Hearing.  (*See* ECF No. 136 at 87:9–88:4 (testimony of the Debtor).)  The court is not persuaded by that attempt.

[28]     The court has considered all of the Debtor's argument to the contrary and finds them to be either inapposite or otherwise unpersuasive.  Because of the foregoing, it is not necessary for the court to consider the "reasonably necessary" prong of Section 522(d)(10)(D).

## V.    CONCLUSION

For the reasons discussed above, the Objection shall be sustained in respect of the Weekly

Payments.[29]

It is **SO ORDERED.**


Dated: March 1, 2012                                    BY THE COURT


                                    Lorraine Murphy Weil
                                    **Lorraine Murphy Weil**
                                    Chief United States Bankruptcy Judge

---

[29]      The Objector does not object to the Exemption with respect to "child support."